## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| KEYBANK NATIONAL ASSOCIATION, | ) | CIVIL ACTION NO. |
| | ) | |
| Plaintiff, | ) | JUDGE |
| | ) | |
| v. | ) | |
| | ) | |
| CHARLES H. WILLIAMS and TIMOTHY WELDON, | ) | **VERIFIED COMPLAINT** |
| | ) | |
| | ) | **(Jury Demand Endorsed Hereon)** |
| Defendants. | ) | |

For its Complaint against Defendants Charles H. Williams ("Williams") and Timothy Weldon ("Weldon"), Plaintiff KeyBank National Association ("Key"), by its attorneys, hereby alleges and states as follows:

### INTRODUCTION

1.     Williams and Weldon are subject to written agreements that contain extremely clear post-employment covenants in favor of Key. While, after leaving Key's employment, Williams and Weldon are not barred from making a living working in the same field as they did for Key, they are prohibited (for one year) from: (1) soliciting or doing business with certain of Key's customers; or (2) using and/or disclosing Key's confidential information and trade secrets. After leaving Key's employment, however, Williams and Weldon did not comply with the simple, clear, reasonable, and necessary restrictions that they each plainly understood.

2.     Key seeks preliminary injunctive relief against Defendants Williams and Weldon, and anyone acting in active concert or participation with them, as well as damages in connection with their breaches of their respective post-employment contractual obligations to Key by, among other things: (1) impermissibly soliciting or doing business with Key's customers within one year of terminating their employment with Key; (2) impermissibly soliciting each other to

leave Key to work for another entity; and (3) misappropriating Key's trade secret and confidential information for their personal benefit and that of their new employer, Newmark Knight Frank ("NKF") by, among other things, impermissibly soliciting and doing business with Key's customers.

3.      Through their unlawful actions, Williams and Weldon have unfairly competed with Key by using misappropriated trade secrets and confidential information as well as knowledge of Key's customers' financial information, business activities and financing needs, and by using such information to solicit and do business with Key's customers, have disturbed such relationships.

4.      Williams and Weldon also solicited each other to obtain new employment at NKF and thereby have disturbed Key's employee relationships.  As a result of their wrongful conduct to date, Key has lost business opportunities with several of its customers with multifamily residential housing financing transactions that closed in 2019 or are ongoing as of this date, as NKF has instead obtained those business opportunities and has received significant fees for the services performed, which fees would otherwise have been earned by Key.  Such lost business has deprived Key of substantial income, well in excess of $75,000.

5.      In addition to the economic losses Key has incurred, Key has already sustained irreparable harm and, absent preliminary injunctive relief, stands to suffer ongoing irreparable harm including, but not limited to, the loss of customer relationships and goodwill.

## PARTIES

6.      Plaintiff Key is organized under the National Bank Act and is deemed a citizen of Ohio because its articles of association identify its principal place of business as being located in Cleveland, OH.

7.     Defendant Williams is an individual who is a citizen of the State of Colorado who resides in Breckenridge, CO.  From August 23, 2007 to January 24, 2019, Williams was employed by Key.  At all relevant times related hereto, Williams was assigned to work out of, and did work out of, Key's offices in Denver, CO.  Williams is now employed by NKF and has substantially the same role at NKF as he had at Key.

8.     Defendant Weldon is an individual who is a citizen of the State of Colorado who resides at 3222 East 1st Avenue, #803, Denver, CO.  From November 2016 to January 24, 2019, Weldon was employed by Key.  At all relevant times related hereto, Weldon was assigned to work out of, and did work out of, Key's offices in Denver, CO.  Weldon is now employed by NKF and has substantially the same role at NKF as he had at Key.

## JURISDICTION & VENUE

9.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000.

10.    Venue is proper within this judicial district under 28 U.S.C. § 1391(b)(2), as a substantial part of the events or omissions giving rise to the claims stated herein occurred in this district.

## BACKGROUND

11.    Key is a national bank that provides a wide range of retail and commercial banking, commercial leasing, investment management, consumer finance, commercial mortgage servicing and special servicing, and investment banking products and services to individual, corporate, and institutional clients across the United States.

12.     Among the various divisions at Key is the Commercial Real Estate Division, which is one of Key's primary sources of business and revenue.

13.     Key's Commercial Real Estate Division operates throughout the country and is divided into a number of regions.

14.     Key employs a team of mortgage bankers and analysts devoted to servicing the commercial real estate financing needs of its customers across a variety of highly specialized industries, including but not limited to, multifamily residential real estate finance.

15.     Employees in the Commercial Real Estate Division provide a variety of services to customers involved with multifamily residential real estate financing, including assistance with securing financing through, among other sources, Freddie Mac and Fannie Mae.

16.     The services relating to multifamily residential housing financing performed by Key's Commercial Real Estate Division are highly specialized and only a small handful of entities provides such services.  A relatively small number of customers exists within the multifamily residential housing financing sector.

17.     Key invests heavily in supporting its mortgage bankers through the provision of resources such as office space, computer and telephone equipment, support staff, back office support, payment of various licensing and registration fees, and Key's goodwill, reputation and relationships.

18.     Key has invested years of time and effort and substantial sums of money to develop the analytical tools required to evaluate proposed transactions in the multifamily residential housing financing sector.

19.     Key has invested years of time and effort and substantial sums of money to develop its knowledge and understanding of the field of potential customers in need of financing in the multifamily residential housing sector.

20.     Many of Key's customers within the multifamily residential housing financing sector are repeat customers who frequently and regularly turn to Key to assist with or provide their financing needs for individual multifamily residential housing properties that those customers previously acquired or intend to acquire.

### Williams' and Weldon's Employment at Key

21.     On or about August 23, 2007, Williams commenced his employment at Key as a Senior Regional Manager within Key's commercial mortgage practice.

22.     On or about March 9, 2014, Williams was promoted to Senior Vice President, Regional Manager, Mortgage Banking, which is a group within the Commercial Real Estate Division, and at all times thereafter worked out of Key's offices in Denver, CO.

23.     Williams was responsible for the Southeast and Rockies regions and oversaw roughly one-quarter of the overall revenue of the Commercial Real Estate Division.

24.     As Regional Manager, Williams was responsible for, among other things, supervising a team of seven to eight mortgage bankers and analysts, including Defendant Weldon, working out of Key's Denver offices.

25.     Williams was responsible for initial interviews of prospective employees for hiring into his group and was responsible for communicating hiring and termination decisions.

26.     As a manager, Williams not only oversaw the operations of the office and the performance of the employees he supervised but was responsible for overseeing and maintaining client relationships.

27.     Mr. Williams had the authority to originate loan transactions and sign applications.

28.     In his capacity as Senior Vice President and Regional Manager, Williams was an important member of management within the Commercial Real Estate Division tasked with devising and implementing strategic and business decisions.

29.     Williams was very highly compensated for the services he performed.

30.     Through the work he performed for Key, Williams developed very close relationships at Freddie Mac and Fannie Mae, which relationships were vital to navigating a customer's application for financing through such entities.

31.     Over the course of each year, Key personnel in the Commercial Real Estate Division attend a number of multifamily residential housing conferences at locations across the country, such as the National Multifamily Housing Counsel's annual meeting and the Interface Student Housing Conference.

32.     As a Regional Manager, Williams was not only expected to attend such conferences, but he was expected to arrange meetings with actual and potential customers at such conferences to learn about and discuss each customer's prospective transaction pipeline.

33.     In the absence of arranging for and conducting customer meetings at such conferences, Key is at a significant disadvantage in securing a pipeline of transactions from actual or prospective customers.

34.     During the course of his employment at Key, Williams, in addition to other compensation awards, received several restricted stock awards.  More specifically, he received restricted stock awards on February 16, 2015 (3,542 units), February 16, 2015 (1,417 units),

February 16, 2015 (2,622 unit), February 15, 2016 (9,532 units), February 20, 2017 (5,274

units), and February 19, 2018 (5,851 units).

35.     Williams' entitlement to each award was subject to his acceptance of the written

terms of the awards (the "Award Agreements").  In all cases, Williams electronically agreed to

the terms and conditions of the awards, and was thereby bound by them.  In all cases, the written

agreements, through the "Acceptance Agreement" attached thereto, provided as follows:

> 4.(a)  Except in the proper performance of my duties for Key, I acknowledge and
> agree that from the date hereof through a period of one (1) year after the
> termination of my employment with Key for any reason, I will not, directly or
> indirectly, for myself or on behalf of any other person or entity, call upon, solicit,
> or do business with any Key customer or prospective customer of Key with
> whom I interacted or learned of during the course of my employment at Key,
> without the written consent of Key (which consent Key may grant or withhold in
> its discretion).

As an example of the Award Agreements, a copy of the February 19, 2018 Restricted Stock Unit

Award Agreement is attached hereto as Exhibit A at ¶ 4.(a).

36.     Each of the Award Agreements also contained a non-solicitation of Key

employees provision as follows:

> 3.  Except in the proper performance of my duties for Key, I acknowledge and
> agree that from the date hereof through a period of one (1) year after the
> termination of my employment with Key for any reason, I will not, directly or
> indirectly, for myself or on behalf of any other person or entity, hire or solicit or
> entice for employment any Key Employee, without the written consent of Key
> (which consent Key may grant or withhold in its discretion).  "Key Employees"
> shall include (i) all current Key employees, and (ii) all persons who were
> employed by Key at any time during the six (6) month period prior to my
> termination from Key.

Exhibit A at ¶ 3.

37.     Each of the Award Agreements is governed by Ohio law and provides for relief

relating to the consequences of Williams' breach of the Restricted Stock Unit Award Agreement

and accompanying Acceptance Agreement as follows:

> I also understand and agree that if I engage in any activity that is in violation of the Plan, the Award Agreement or this Acceptance Agreement, such conduct may cause serious damage and irreparable injury to Key, and Key at its election may terminate my employment (if I am still employed), seek monetary damages and attorneys fees, and injunctive relief with the necessity of posting bond, as well as any and all other equitable relief to which it may be entitled under the law, the Plan, the Award Agreement and this Acceptance Agreement.

Exhibit A at ¶ 6.

38.     In or around November 2016, Key offered Weldon employment as a Vice President in the Mortgage Banking group and was assigned to work out of the Denver, CO offices.

39.     Weldon's hiring by Key was made with the understanding and agreement that he would work with and under the direction of Williams.

40.     Williams and Weldon worked together as a team serving the same Key customers.

41.     During the course of his employment at Key, Weldon also received several restricted stock awards.  More specifically, he received restricted stock awards on February 20, 2017 (263 units), February 19, 2018 (142 units), and February 19, 2018 (1,427 units).

42.     Weldon's entitlement to each award was subject to his acceptance of the Award Agreements, which agreements are materially the same as those granted to Williams.  In all cases, Weldon electronically agreed to the terms and conditions of the awards, and was thereby bound by them.  In all cases, the written agreements, through the "Acceptance Agreement" attached thereto, provided that he would not solicit or do business with any of Key's customers for a one-year period after leaving Key.  As an example of Weldon's Award Agreements, a copy of one of the February 19, 2018 Restricted Stock Unit Award Agreement is attached hereto as Exhibit B at ¶ 4.(a).

43.    Each of the Award Agreements also contained an agreement not to solicit Key employees.  Exhibit B at ¶ 3.

44.    Each of the Award Agreements is governed by Ohio law and provides for relief relating to the consequences of Weldon's breach of the Restricted Stock Unit Award Agreement and accompanying Acceptance Agreement.  Exhibit B at ¶ 6.

45.    As a condition of employment, Williams and Weldon each electronically accepted an Agreement Regarding Trade Secrets, Intellectual Property, and Non-Solicitation of Employees (the "Trade Secret Agreement"), most recently in December 2018.  Attached hereto as Exhibit C.

46.    Williams and Weldon each agreed to keep Key's trade secrets and confidential information protected and confidential both during **and after** their employment with Key, and to immediately return to Key "all documents, data, information, and equipment in [their] possession or to which [they] have access that may contain such Trade Secrets":

> **4. Confidentiality of KeyCorp's Trade Secrets**
>
> I recognize the importance of preserving the confidentiality of Trade Secrets of KeyCorp.  Therefore, I agree that: (a) during my employment with KeyCorp, I will acquire, reproduce, and use such Trade Secrets only to the extent reasonably necessary for the proper performance of my duties; (b) **during and after my employment with KeyCorp, I will not use, publish, sell, trade or otherwise disclose such Trade Secrets**; and (c) upon termination of my employment with KeyCorp, I will immediately return to KeyCorp all documents, data, information, and equipment in my possession or to which I have access that may contain such Trade Secrets. . . .

*Id.* at ¶ C (emphasis added).

47.    The Trade Secrets Agreement broadly defines the term "Trade Secrets", as follows:

> "Trade Secret" means **information covered by** the Defend Trade Secrets Act, 18 United States Code § 1839, **the Uniform Trade Secrets Act as adopted in Ohio**

> **[Ohio Rev. Code § 1333.61(D)] and any and all** processes, techniques,
> programs, software, formulas, methods, **financial information, compilations
> and lists**, and other business information or plans that are developed, owned,
> utilized, or maintained by an employer such as KeyCorp, and that of its customers
> or suppliers, and that are not in the public domain.

*Id.* at ¶ 1.b (emphasis added).

48.     Pursuant to the Uniform Trade Secrets Act as adopted in Ohio, the definition of

"Trade Secrets" expressly includes the "listing of names, addresses, or telephone numbers" of

customers.

49.     Williams and Weldon also each agreed that any violation of the Trade Secrets

Agreement would cause serious and irreparable injury to Key warranting injunctive relief:

> c.   I also acknowledge and agree that **any violation of this Agreement may
> cause serious damage and irreparable injury to KeyCorp, which will permit
> KeyCorp to . . . seek** repayment of incentive compensation previously paid, and
> to seek other damages, which may include punitive or exemplary damages, **an
> injunction to prohibit me from using or misappropriating its trade secrets
> and competing unlawfully, injunctive,** and/or other monetary and equitable
> **relief against me and those in active concert or participation with me** as
> permitted by applicable law.

*Id.* at ¶ 7.c (emphasis added).

50.     According to its terms, the "validity, interpretation, and performance of [the Trade

Secrets Agreement] shall be construed under the laws of Ohio."  Exhibit C at ¶ 7.a.

51.     Williams and Weldon each further agreed that Key would be entitled to

reasonable attorney's fees if it prevailed in any dispute, proceeding, or suit to enforce the Trade

Secrets Agreement.  *Id.* at ¶ 7.b.

52.     Finally, the Trade Secrets Agreement makes plain that it was "in addition to and

not in limitation of any other agreement to which" Williams and Weldon were a party with Key.

*Id.* at 7.d.

53.    During their employment at Key, Williams and Weldon were each provided with various forms of support to help them perform their jobs and to succeed in their respective roles, including but not limited to, access to computer systems, customer lists, research and development, back office support, payment of fees for professional education, state registrations, and licenses, industry conference attendance, and the overall goodwill of Key.

54.    Over the course of their time at Key, Williams and Weldon came to work with dozens of customers, and learned of each customer's financing needs and preferences.

**Williams and Weldon Abruptly Terminated Their Employment**

55.    On January 24, 2019, Williams and Weldon each abruptly resigned their employment with Key without any prior notice or warning; both resignations were effective as of that day.

56.    Each one had already sought legal advice regarding the scope of their post-employment agreements. Weldon had received advice specifically advising him: "If you tried to take customers that were Key customers before you got there that would be a big problem. If you tried to take customers that were your contacts prior to employment at Key but became customers of Key while you worked there that would also be a problem." Upon information and belief, Weldon discussed this advice with Williams.

57.    Evidently effective as of the same day they terminated their employment with Key, Williams and Weldon each immediately commenced their new employment at NKF.

58.    Upon information and belief, Williams and Weldon perform the same functions and have the same duties at NKF within the multifamily residential housing financing sector as they had at Key and are in frequent communication and contact with actual or prospective customers.

59.     Prior to terminating his employment with Key, and in anticipation of becoming employed by NKF, on or about December 29, 2018, Williams forwarded to NKF employee Mike May a list of 32 Key customers for whom he had provided services in recent years.

60.     Following their departures, on or about February 5, 2019, Key sent letters to Williams and Weldon reminding them of the contractual obligations that survived the termination of their employment.  Copies of the February 5, 2019 letters are attached hereto as Exhibit D.  Key followed up with Williams on or about September 27, 2019, and to Weldon on or about October 24, 2019, with cease-and-desist letters, which were also sent to NKF, again reminding them of their legal obligations; and demanding that the Defendants cease and desist from the improper solicitation or servicing of Key's customers; and further demanding that each provide sworn assurances with respect to same.  Copies of the September 27, 2019 and October 24, 2018 letters are attached hereto as Exhibit E.

61.     Defendants have refused to comply with Key's reasonable demands.

62.     On information and belief, Williams and Weldon, in direct contravention of their contractual obligations, have had business contact with numerous Key customers, and as of the date of this Complaint, have actually performed services for at least three of those Key customers.

63.     On information and belief, Williams, while employed by NKF, has provided financing services and assisted with completing transactions for Key's customers Priderock Capital Partners, Grand Peaks Properties, and Peak Capital Partners, in addition to others.

64.     By virtue of the services performed by Williams and Weldon, their new employer has received significant financial benefits, some of which have flowed to Williams and Weldon,

which were only obtained because of Williams' and Weldon's misuse of Key's trade secret or confidential information.

65.     More recently, Key has learned that Williams has advised one or more prospective customers that he could obtain better financing for them at NKF than Key could. While Key vigorously disputes that this is the case, any Key customer would reasonably believe that Williams had made such an assessment based on his knowledge of Key's confidential pricing protocols.

**Key is suffering significant and irreparable harm.**

66.     Defendants' continuing solicitation of or doing business with Key's customers has caused and is causing irreparable harm to Key.

67.     Separate from the actual loss of customers, the solicitation efforts and actual performance of services for Key's customers on the part of Williams and Weldon has resulted in the loss of Key's goodwill with its customers.

68.     By virtue of their prior and ongoing solicitation of Key's customers, and actually doing business with at least several of Key's customers, Williams and Weldon have shown an intent to disregard their contractual obligations and, without restraint, it is inevitable that they will continue to solicit and do business with many of Key's customers.

69.     Through their actions of performing services for Key's customers in direct contravention of their contractual obligations, Williams and Weldon have personally profited at the direct expense of Key.

70.     The damage that Williams and Weldon have caused and continue to cause by soliciting or doing business with Key's customers is difficult, if not impossible, to quantify.

## FIRST CLAIM FOR RELIEF
### Breach of Contract against Williams

71.     Key incorporates the allegations of ¶¶ 1 through 70 above into this paragraph as if they were fully re-written herein.

72.     Pursuant to the terms of each of the Restricted Stock Unit Award Agreements he received, Williams expressly agreed that he would not, for a period of one year after terminating his employment, solicit or do business with any of Key's customers.

73.     Pursuant to the terms of Trade Secrets Agreement, Williams expressly agreed that, after his employment with Key terminated, he would not retain or use any of Key's confidential, trade secret information.

74.     Key has done all that it was required to do under the terms of each of the Restricted Stock Unit Award Agreements and the Trade Secrets Agreement.

75.     Williams has materially breached the terms of the Trade Secrets Agreement by forwarding customer information to his new employer, NKF, and once established in his employment with NKF, using trade secret and confidential information to solicit and/or do business with many of Key's customers.

76.     Williams has materially breached the terms of each of the Restricted Stock Unit Award Agreements by soliciting and doing business with many of Key's customers (i.e., at least a dozen) within the restricted one-year period.

77.     Williams is known to have directly provided financing services to at least three of Key's customers with multifamily residential housing financings that were completed in 2019.

78.     Williams is also known to have had business contact with many Key customers after his departure from Key wherein he discussed and thereby solicited business from such customers.

79.     Importantly, to the extent that Williams has assisted any Key customer with the submission of an application to Freddie Mac or Fannie Mae since his departure from Key, such act also prevents Key from making a submission to Freddie Mac or Fannie Mae with respect to that customer or any other customer that might be exploring financing for the particular property at issue. Each of Freddie Mac and Fannie Mae limits applications for any particular transaction to just one entity. Thereby, Williams' actions inflict immediate financial harm upon Key.

80.     Williams has also materially breached the terms of each of the Restricted Stock Unit Award Agreements by working with and soliciting Weldon to terminate his employment at Key and to become an employee of NKF.

81.     Williams' material breaches of each of the Restricted Stock Unit Award Agreements and the Trade Secrets Agreement have caused harm, including irreparable harm, to Key.

82.     As a result of Williams' material breaches of each of the Restricted Stock Unit Award Agreements and the Trade Secrets Agreement, Key is entitled to preliminary injunctive relief, monetary damages, and Key's reasonable attorney's fees.

### SECOND CLAIM FOR RELIEF
**Breach of Contract against Weldon**

83.     Key incorporates the allegations of ¶¶ 1 through 82 above into this paragraph as if they were fully re-written herein.

84.     Pursuant to the terms of each of the Restricted Stock Unit Award Agreements he received, Weldon expressly agreed that he would not, for a period of one year after terminating his employment, solicit or do business with any of Key's customers.

85.    Pursuant to the terms of Trade Secrets Agreement, Weldon expressly agreed that, after his employment with Key terminated, he would not retain or use any of Key's confidential, trade secret information.

86.    Key has done all that it was required to do under the terms of each of the Restricted Stock Unit Award Agreements and the Trade Secrets Agreement.

87.    Weldon has materially breached the terms of the Trade Secrets Agreement by using trade secret and confidential information to solicit and do business with several of Key's customers for his new employer, NKF.

88.    Weldon has materially breached the terms of each of the Restricted Stock Unit Award Agreements by working with and soliciting Williams to terminate his employment at Key and to become an employee of NKF.

89.    Weldon's material breaches of each of the Restricted Stock Unit Award Agreements and Trade Secrets Agreement have caused harm, including irreparable harm, to Key.

90.    As a result of Weldon's material breaches of each of the Restricted Stock Unit Award Agreements and the Trade Secrets Agreement, Key is entitled to preliminary injunctive relief, monetary damages, and Key's reasonable attorney's fees.

### THIRD CLAIM FOR RELIEF
**Misappropriation of Trade Secrets against Williams**
**Ohio Uniform Trade Secrets Act**

91.    Key incorporates the allegations of ¶¶ 1 through 90 above into this paragraph as if they were fully re-written herein.

92.    Key has invested significant time, effort, and money to develop numerous trade secrets including but not limited to its lists of customers and prospects which include the names, addresses, and phone numbers of each customer and prospect as well as information about each such customer, including but not limited to its interests and proclivities to invest in certain types

of multifamily residential housing transactions, financial condition, and overall financing needs. These lists also include ratings and evaluations of Key's past, current, and prospective customers. Based on a range of factors, Key evaluates and grades its customers and prospective customers according to its understanding of the customers' current needs. Key relies on its customer lists and compilations to guide its approach to its customers and prospective customers and to anticipate their needs in the marketplace.

93.     Key's trade secrets derive independent economic value from not being known outside of Key.

94.     Key aggressively protects the secrecy of its trade secrets and strictly enforces rules limiting access to same. Specifically, Key controls access to its customer lists, ratings, and evaluations, which are maintained on Key's computer network, by requiring passwords to access such information. A select group of members of the Commercial Real Estate Division with a legitimate, demonstrated need for access to customer account information is afforded access.

95.     All confidential documents of Key are maintained on Key's computer network in shared drives. Each shared drive is established to limit access to those Key employees who are approved to use the documents on that drive.

96.     Moreover, Key's work stations an laptops do not accept external hard drives and do not print to non-network printers. When documentation is printed, Key maintains a log of such print job.

97.     With respect to email usage, Key not only retains the ability to monitor email activity, it actively tracks and preserves email communications that are sent to outside email addresses. Key also requires the use of encryption when sensitive and client personal documentation is emailed to recipients outside of Key.

98.     In addition to confidentiality obligations found in individual employment agreements, every Key employee is required to certify their confidentiality obligations to Key on an annual basis. Key also adopts and publishes detailed policies and procedures governing the handling of confidential and trade secret information and documents.

99.     Preserving the secrecy of its customer lists, ratings, and evaluations provides Key a competitive advantage over its rivals. If its competitors obtained Key's customer lists, ratings, and evaluations, Key would lose that competitive advantage.

100.    Williams acquired possession of Key's trade secrets, including but not limited to the client lists and information about such clients while employed at Key and maintained such lists after resigning from Key through improper means.

101.    Williams has made constant and repeated use of Key's trade secrets, including Key's client lists, without Key's authorization or permission since resigning his employment at Key, and his further use or disclosure of Key's trade secrets is threatened.

102.    Williams' misappropriation of Key's trade secrets has caused harm, including irreparable harm, to Key.

103.    As a result of Williams' misappropriation of trade secrets, pursuant to Ohio Rev. Code Ann. § 1333.62, Key is entitled to preliminary injunctive relief restraining Williams from making further use of Key's trade secret or confidential information and to restrain him from soliciting or doing business with Key's customers.

104.    As a result of Williams' misappropriation of trade secrets, pursuant to Ohio Rev. Code Ann. § 1333.62, Key is entitled to recovery of economic damages, including treble damages, in an amount to be determined at trial.

105.    As a result of Williams' willful or malicious misappropriation of Key's trade

secrets, Key is entitled to recover its attorney's fees.

**FOURTH CLAIM FOR RELIEF**
**Misappropriation of Trade Secrets against Weldon**
**Ohio Uniform Trade Secrets Act**

106.    Key incorporates the allegations of ¶¶ 1 through 105 above into this paragraph as

if they were fully re-written herein.

107.    Key has developed numerous trade secrets, including but not limited to its client

lists, including the names, addresses and phone numbers of each client on those lists, as well as

information about each such customer, including but not limited to its interests and proclivities to

invest in certain types of multifamily resident housing transactions, financial condition and

overall financing needs.

108.    Key has invested time, effort, and money to develop its trade secrets.

109.    Key's trade secrets derive independent economic value from not being known

outside of Key.

110.    Key implements reasonable measures to protect the secrecy of its trade secrets,

including limiting access to the trade secrets as they are stored on Key's computer network and

requiring those who have access to sign agreements with confidentiality provisions with Key.

111.    Weldon acquired possession of Key's trade secrets, including but not limited to

the client lists and information about such clients while employed at Key and maintained such

lists after resigning from Key through improper means.

112.    Weldon has made constant and repeated use of Key's trade secrets, including

Key's client lists, without Key's authorization or permission since resigning his employment at

Key and his further use or disclosure of Key's trade secrets is threatened.

113.   Weldon's misappropriation of Key's trade secrets has caused harm, including irreparable harm, to Key.

114.   As a result of Weldon's misappropriation of trade secrets, pursuant to Ohio Rev. Code Ann. § 1333.62, Key is entitled to preliminary injunctive relief restraining Weldon from making further use of Key's trade secret or confidential information and to restrain him from soliciting or doing business with Key's customers.

115.   As a result of Weldon's misappropriation of trade secrets, pursuant to Ohio Rev. Code Ann. § 1333.62, Key is entitled to recovery of economic damages, including treble damages, in an amount to be determined at trial.

116.   As a result of Weldon's willful or malicious misappropriation of Key's trade secrets, Key is entitled to recover its attorney's fees.

## FIFTH CLAIM FOR RELIEF
### Intentional Interference with a Business Relationship Against Williams

117.   Key incorporates the allegations of ¶¶ 1 through 116 above into this paragraph as if they were fully re-written herein.

118.   As an employee of Key, Williams was afforded access to some of Key's most confidential information, namely introductions and access to Key's customers so as to allow Williams to perform services for such customers.

119.   Many of Key's customers within the multifamily residential housing financing sector are repeat customers who frequently turn to Key to assist with their financing needs in connection with a particular multifamily residential housing property that the customer previously acquired or intends to acquire.

120.    Because of the repeat nature of the services that Key performs for any individual multifamily residential housing financing customer, Key has a reasonable expectation that such customers will look to Key to provide financing services for upcoming transactions.

121.    In order to best service its customers and understand their needs, it is imperative that Key attend and meet with as many of its customers as possible at the various multifamily residential housing conferences that take place each year, such as the National Multifamily Housing Counsel's annual meeting, so as to understand what each customer's pipeline and needs will be in the months after such conferences. In advance of each such annual meeting, Williams would schedule appointments to meet with Key's customers. Leading up to the 2019 conference, Williams repeatedly assured his superiors that he had scheduled the meetings for which he was responsible. In fact, Williams scheduled none of the meetings for which he was responsible.

122.    Upon information and belief, prior to his departure from Key, Williams knowingly refused and intentionally failed to arrange for any meetings with any of Key's multifamily residential housing customers in the Southeast and Rockies regions – the regions he was responsible for – at the National Multifamily Housing Counsel's annual meeting on January 29-31, 2019.

123.    Instead, with the knowledge of the identity of Key's customers in the multifamily residential housing sector, and having transmitted to NKF a list of certain of those customers in advance of his hiring by NKF, Williams was able to contact, meet with, or otherwise communicate with Key's customers immediately or soon after his departure from Key in an effort to secure business from or otherwise perform services therefor as an employee of NKF.

124.     Based on his employment at Key, Williams knew that Key had business relationships with, among many others, Priderock Capital Partners, Grand Peaks Properties, and Peak Capital Partners.

125.     After he became employed by NKF, and in derogation of Key's relationships with Priderock Capital Partners, Grand Peaks Properties, and Peak Capital Partners, among many others, Williams intentionally, maliciously, wantonly, willfully, and with reckless indifference to Key's rights interfered with Key's business relationships with those customers by doing business with them to the exclusion of Key's ability to provide the same services to such customers. Williams did so for the purpose of realizing personal gain and profit, despite that he was not permitted or entitled to do business with those customers of Key.

126.     Based on Williams' servicing of each of Priderock Capital Partners, Grand Peaks Properties, and Peak Capital Partners, among others, in 2019, he was able to provide financing services for each customer with the completion of one or more financing transactions in 2019 for which he and NKF received compensation for performing.

127.     Key was damaged by Williams' provision of services and assistance in completing financing transactions with its customers in 2019 because Key was not able to obtain the revenue it otherwise would have received had Key personnel, rather than Williams, performed the financing services for Priderock Capital Partners, Grand Peaks Properties, Peak Capital Partners, and others.

## SIXTH CLAIM FOR RELIEF
### Breach of the Duty of Loyalty Against Williams

128.     Key incorporates the allegations of ¶¶ 1 through 127 above into this paragraph as if they were fully re-written herein.

129.     As an executive and employee at Key, Williams was afforded access to some of Key's most confidential information, namely introductions and access to Key's customers so as to allow Williams to perform services for such customers.

130.     In permitting Williams to have access to and work with its customers, Key trusted that Williams would carefully guard the information and only use it in furtherance of his activities while an employee of Key.

131.     As an executive and employee at Key, Williams owed a duty to act in the utmost good faith and loyalty towards Key.

132.     By forwarding a list of actual Key customers to a direct competitor while still employed at Key, Williams failed to act in Key's best interests and instead put his own financial interests, and those of his future employer, ahead of Key's interests. Similarly, by intentionally failing to arrange for any meetings with any of Key's multifamily residential housing customers at the National Multifamily Housing Counsel's annual meeting on January 29-31, 2019, Williams failed to act in Key's best interests and instead put his own financial interests, and those of his future employer, ahead of Key's interests.

133.     By virtue of his conduct in forwarding the customer list to NKF, Williams breached his duty of loyalty to Key.

134.     As a direct consequence of Williams' actions, Key has been damaged by the sharing of its confidential customer information with a competitor and has further suffered immediate and actual financial damages as a result of Williams' subsequent use of the customer information to obtain business from Key's customers that otherwise would have been realized by Key.

WHEREFORE, Plaintiff, Key, demands that judgment be entered in its favor and against Defendants, Charles H. Williams and Timothy Weldon, as follows:

(a)     On the First Claim for Relief, for money damages in excess of $75,000, including disgorgement of any compensation received relating to the performance of services to any of Key's customers during the one year restriction period and for any future services that may be performed after such time as the result of improper contact with Key's customers during the one year restriction period;

(b)     On the Second Claim for Relief, for money damages in excess of $75,000, including disgorgement of any compensation received relating to the performance of services to any of Key's customers during the one year restriction period and for any future services that may be performed after such time as the result of improper contact with Key's customers during the one year restriction period;

(c)     On the Third Claim for Relief, for money damages in excess of $75,000, including treble damages;

(d)     On the Fourth Claim for Relief, for money damages in excess of $75,000, including treble damages;

(e)     On the Fifth Claim for Relief, for money damages in excess of $75,000;

(f)     On the Sixth Claim for Relief, for money damages in excess of $75,000;

(g)     For an Order preliminarily and permanently enjoining (only to the extent of any equitable extension of period of the covenants) the Defendants, and anyone acting in concert or participation with them, from doing business with or soliciting any business from any customer of Key whom the Defendants served and whose names became known to the Defendants while in the employ of Key;

(h)     For an Order requiring the Defendants, and anyone acting in concert or participation with them, upon notice, to return to Key any and all documents and information pertaining to Key customers whether in original, copied, electronic, or any other reproduced form;

(i)     For an Order setting a date for a hearing on Key's request for a preliminary injunction, as well as a briefing schedule for same;

(j)     For an Order extending the time period of the restrictive covenants breached by Williams and Weldon so as to afford Key the full benefit of its contractual rights;

(k)     For punitive or exemplary damages with respect to the Third through Sixth Claims for Relief, in an amount to be proven at trial;

(l)     For its attorney fees, awarded based on the applicable contracts and statutes;

(m)     For prejudgment and post-judgment interest; and

(n)     For such further and additional relief as the Court deems just and equitable.

Dated: December 30, 2019                    Respectfully submitted,


/s/ David C. Walker
David C. Walker
**Brown Dunning Walker PC**
2000 S. Colorado Blvd.
Tower Two, Suite 700
Denver, CO  80222
ph:  303-329-3363
fax: 303-393-8438
dwalker@bdwfirm.com


Of Counsel
Steven S. Kaufman
Chad D. Cooper
**Kaufman & Company LLC**
1001 Lakeside Avenue, Suite 1710
Cleveland, Ohio 44114
PH: (216) 912-5500
FX:  (216) 912-5501
Steve.Kaufman@Kaufman-Company.com
Chad.Cooper@Kaufman-Company.com


Christopher Kip Schwartz, Esq.
**Kaufman & Company, LLC**
1010 Wisconsin Avenue NW, Suite 540
Washington, D.C. 20007
Phone: (202) 342-0413
Fax: (202) 330-5272
Kip.Schwartz@Kaufman-Company.com


Attorneys for KeyBank National Association

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Plaintiff respectfully demands a trial by jury on all claims and issues triable by a jury.

*/s/ David C. Walker*
One of the attorneys for Plaintiff,
KeyBank National Association

## **VERIFICATION**

Pursuant to 28 U.S.C. § 1746, the undersigned verifies under penalty of perjury that the foregoing is true and correct.

Executed on December 30, 2019.

Janette M. O'Brien